## Lafferty's Estate. Lafferty's Appeal.

*Corporations—Will—Power of trustee to vote stock.*

Testator gave his stock in a corporation to three trustees for certain life beneficiaries. He directed that at all elections of said company the stock should be voted as his son, one of the trustees, should direct and appoint, and the trustees were directed to give a proxy or authority to vote the stock as the son might desire to vote the same. At the date of testator's death, the son was the president of the corporation. The cotrustees having refused to give the voting trustee the proxy directed by the will, the latter applied to the orphans' court for an order to compel them to do so. The court found that the evidence was insufficient to sustain the allegation that the voting trustee intended to make a fraudulent use of the proxy, and made the order prayed for in the petition. *Held*, on appeal, by an equally divided court, that the decree of the orphans' court should be affirmed.

Argued April 3, 1893. Appeal, No. 249, Jan. T., 1893, by Rose E. Lafferty and Patrick J. Corcoran, two executors and trustees of the will of Charles Lafferty, deceased, from decree of O. C. Phila. Co., ordering them to furnish a proxy to their cotrustee to vote certain stock belonging to the estate. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.

Petition by Charles H. Lafferty, an executor and trustee of Charles Lafferty, deceased, for an order to compel his cotrustees to give him proxy to vote stock. ·

The petition set forth the death of Charles Lafferty on October 10, 1885, the probate of his will and codicil containing a clause directing a proxy to be given to petitioner; that Rose E. Lafferty, Patrick J. Corcoran and petitioner are trustees and executors of the will; that the estate owns 6900 shares of stock of The Hestonville, Mantua and Fairmount Passenger Railroad Company and that a demand was made by petitioner upon his cotrustees for a proxy to vote the stock at the annual election, which was refused. The petition contained a prayer for a decree to compel the coexecutors and trustees to execute a proxy to petitioner and to restrain them from interfering with his voting the stock.

The answer averred that, in proceedings in C. P. No. 1, Phila. Co., and in the Supreme Court, [149 Pa. 70] the codicil was held not capable of enforcement against the dissent of respondents because it deprived them of the right of franchise which is one of the essential elements of ownership to the stock vested in them. The answer also stated that a letter signed by the other cestuis que trust had been received, requesting them to refrain from executing a proxy to petitioner, and that a copy was sent to petitioner. That petitioner caused the vote upon 13,900 shares of stock belonging to the estate to be cast for himself as president and a board of directors who were entirely subservient to him; that he caused the affairs of the company to be corruptly and dishonestly mismanaged, caused his own salary to be doubled in amount, and kept the stock so depressed in the market that it was impossible for the estate to make sales thereof, and reaped for himself profits at the expense of the estate, which received no revenue from the stock during the period that he and his confederates were in control; that respondents attended the last annual meeting of the company and requested petitioner to join with them in voting for officers of recognized efficiency and probity, that petitioner declined to do so, but insisted upon voting the stock owned by the estate for himself. The stock was disfranchised, the stockholders were thereupon enabled to elect a president and board of directors, who assumed control and by honest and judicious management materially increased the earnings of the road, enhanced the value of the property of the company and of the stock in the market, whereby the estate of decedent was greatly benefited.

It was also stated that if petitioner obtained a proxy he would use it to oust the officers in charge of the road, for his own selfish ends.

A large amount of testimony was taken, and after argument upon petition, answer and proofs, the prayer of the petitioner was granted, in the following opinion by ASHMAN, J.:

"The petitioner has applied for an order upon his coexecutors to furnish him with a proxy to vote upon the shares held by the estate in the capital stock of a passenger railway company. His prayer is based upon the following clause in the codicil to the testator's will: 'I do hereby authorize and direct, that all the stock held by me in the Race and Vine streets,

Arch street and Hestonville Passenger Railway Company, shall be voted at all elections of said companies, as my son, Charles Lafferty, shall direct and appoint, and my executors are directed to give a proxy or authority to vote said stock as he may desire to vote the same.'

"The proxy was refused by the coexecutors upon grounds: (1) That the authority attempted to be conferred by the codicil was against public policy, and, therefore, void ; (2) because, in his use of the proxy, the petitioner intended to benefit himself at the expense of the trust; and, (3) because, as an officer of the corporation issuing the stock, he had grossly mismanaged its affairs, and had impaired the value of its securities.

"If the first of these reasons is tenable, the case is disposed of. It follows the principle that the franchise is an inseparable incident of the ownership of stock. We are so far from combating the doctrine that we would give to it in every instance the largest and freest play. In acquiring its stock, the shareholder in every corporation assumes a double duty; to the public, in seeing that the corporate acts shall conform to law, and to other investors, in seeing that the corporate acts shall work them no injustice. Any contract, therefore, by which he retains the legal title, and yet seeks to denude himself of the legal responsibilities which should attend it, offends equally against the welfare of the community and the interests of individuals. This position was elaborately discussed in Shepaug Voting Trust Cases, 60 Con. 553, where a power, indefinite as to duration, given by a syndicate to a trust company to vote upon the syndicate's stock, had been used at one annual meeting, and was held to be a mere power of attorney, and hence subject to the state law, which prohibited such a power from operating for a longer period than one year.

"It was there said : 'It is the policy of our law that an untrammeled power to vote shall be incident to the ownership of the stock, and a contract by which the real owner's power is hampered by a provision therein that he shall vote just as somebody else dictates, is objectionable. . . . It is the policy of our law that ownership of stock shall control the property and the management of the corporation, and this cannot be accomplished, and this good policy is defeated, if stockholders are permitted to surrender all their discretion and will, in the important

matter of voting, and to suffer themselves to be mere passive instruments in the hands of some agent who has no interest in the stock, equitable or legal, and no interest in the general prosperity of the corporation.'

"But what is there in this codicil which is subversive of this doctrine? It does not present the case of an owner who has parted with an incident of ownership, the franchise, to a person who has no beneficial interest therein; on the contrary, it is the case of three joint owners, each holding an undivided interest in all of the stock. It is very manifest that these trustees cannot cast separate votes; they must all unite as to every share, and if one of them dissents from the choice of his fellows, the opportunity of exercising the franchise is lost to them all. The testator endeavored to provide against such an emergency, and, while he vested the title to the stock in three persons, he delegated the vote which it authorized to one whom he selected out of the three. Whether his selection of that person was a tribute to the fitness of the voter, or was the the arbitrary utterance of his own will, is of little consequence; he had at least this warrant for his action, that divided councils would not disfranchise the stock, and that the party who should cast the vote would be an owner, and would have an equal interest with the other owners in voting wisely. The device by which the testator sought to carry out his plan was clumsy, in this: that by prescribing a formal proxy, where the proxy had in fact been already given in the will, he put it in the power of either of the respondents to prevent the stock from being voted at all. The cases which were cited in the argument are cases where the absolute owners have abandoned an incident of ownership; but these trustees are not absolute owners, and they cannot, if they would, wield the powers of an absolute ownership. They cannot sell, nor invest, nor borrow, except as they are authorized by the will. If the testator had said that they should sell only in case one of their number, whom he designated, should deem it expedient to sell, what right of the trustees, or of the cestuis que trusts, would be infringed; and has he done more in saying that they shall vote as the petitioner, to whom he has intrusted the duty, shall decide?

"The respondents acquiesced in this view for five years. That at this late day they begin to complain that they have

been shorn of their power, ought not to deprive them of a remedy, if a wrong has been done them, although it does tend to show that the injury has not been great. The real base of their complaint, and upon that foundation they have certainly built a gloomy superstructure, is that the petitioner used the voting capacity of the proxy to enhance his own interests at the expense of the trust; and that the grand contrivance by which he effected this fraud was his election to the presidency, to which that vote contributed. They mean by this to invoke the rule that a trustee shall not make a profit for himself out of the trust. But this rule is not to be interpreted with a literalness so absolute as to exclude a trustee from reaping the incidental advantages which may spring from his office. For example, his management of a fund of a few hundreds may be so efficient that it shall secure for him a post whose emoluments amount to thousands. Is he to surrender these fees because, except for the accident of his trustship, he might never have earned them? A doctrine like that would stifle ambition where it is most needed. The act of the petitioner in procuring his election to the head of the company, by his own vote, admitting that fact to have been proved, was not, in itself, a wrong to the trust, even if it added to his power; the increased power would enure to the advantage of the trust, and through it the trust would rule the company.

"But it is alleged that his policy while president was ruinous to the corporation, and therefore to the trust estate. We do not propose to catalogue the alleged offences. The gravest were that he caused his salary to be doubled; had formed a board of directors who were his tools; had occupied for his own purposes a farm of which the rent was paid by the company, and had used for his own horses feed which had been bought for its stables; and by his general mismanagement had so depressed the price of the company's stock that the estate was unable to dispose of its holdings. If these charges had been made out, we should still doubt our power to refuse the relief which had been demanded by the petitioner. Upon the ground that he was imperiling the estate, we might dismiss him from the trust, but so long as we suffered him to remain a trustee, we could not well abridge the authority which, in that capacity, has been given him by the will.

" Two reasons are assignable against the present application of the rule that equity will not enforce the execution of a power in favor of a trustee who is disposed to use it to the detriment of his cestui que trust. The power did not, as in Foll's Ap., 91 Pa. 434, originate in a contract made by the petitioner or to which he was a party; it was annexed by the testator to the office of trustee, and we cannot separate an office from its functions. Nor were the acts of the petitioner which are complained of acts committed as a trustee, but as president, whose evils to the trust are only a reflex of the injuries to the corporation. And if the answer of the respondents, so far as it is responsive to the petition, must be accepted as true until overcome by adequate evidence, we must enter upon an inquiry affecting a corporate body which is not before us, and which cannot be affected by our decree. We are doing this, too, at the instance, not of shareholders, as such, but of cestuis que trusts. It is, perhaps, the first time in which a court of our limited jurisdiction has sat in judgment upon the internal management of a corporation, which was not at the same time a trustee. The respondents and their beneficiaries have a forum open to them, but they have preferred no complaint there, nor in the corporation where the wrongs are said to have been done.

" In R. R. v. Elkins, 37 N. J. Eq. 273, it was said: 'If the complainant, in virtue of his ownership of a majority of the stock, elected a board of directors of his own selection, and they should endeavor to misuse the franchises of the corporation, or improperly manage its affairs in the interest of other companies to the prejudice of its stockholders as a class, the remedy is by proceedings by the attorney general as the representative of the public, or by other stockholders whose rights may be injured by the unlawful acts of the directors.'

" It is a remarkable fact that although the petitioner has, according to the answer, so far imperiled the finances of the company that his cotrustees have deemed it unsafe to intrust him with a proxy to vote at an election, no other stockholder has yet called him to account. Assuming, then, the duty which the corporators must have neglected, we find in the answer this averment: 'The said petitioner caused the affairs of said company to be corruptly and dishonestly mismanaged; caused his own salary to be doubled in amount, and the stock to be so

depressed in the market that it was impossible for the estate to make sales thereof.' Yet the evidence is that when the petitioner entered the service of the company as its president, its stock was selling at $6.00 per share, and when he left it at $31.00 per share, an advance of 500 per cent. The evidence also is that, in spite of their declared inability to sell, the executors did sell 7000 shares at a large profit to the estate. It shows further that the petitioner was president of the railway company at the time of his father's death and for seven years before that time ; a circumstance which may naturally have led the testator to intrust him with the voting power. It is charged that he intends to use the proxy to secure his election. But as the proxy covers only 6900 shares, while the total issue of stock numbers 40,000 shares, it is evident that his canvass, to be successful, must receive a very substantial support from the shareholders, and this in turn implies their acquiescence in his methods.

" The most serious allegation against him is that he used the company's farm for pasturing his own cattle, and purchased feed for use in his own business from the company. But the proof was that he paid the company for both boarding and feed. The practice is not to be favored, because a man cannot safely be buyer and seller in the same transaction ; but it is not necessarily dishonest. In this instance it took nothing from the revenues of the company, and it did not operate even remotely upon the interests of the trust. On this point STRONG, J., said, in Ashhurst's Ap., 60 Pa. 314 : ' Why may not directors of a corporation sell to themselves. Each director has an interest distinct and antagonistic to his interest as a mere man. There is identity of persons but not of interests. There must be many things which directors can do for their individual benefit which are binding upon a corporation of which they are directors. . . . And though ordinarily the law frowns upon contracts made by them in their representative character with themselves as private persons, such contracts are not necessarily void. They are carefully watched and their fairness must be shown.'

" To sum up, we have a will by which a testator gives his stock in a corporation to three trustees for certain life beneficiaries, and directs that the vote upon that stock shall be cast

by one of the trustees, whom he designates.   We find that the
trustee so named was president of the corporation at the time
of the testator's death.   The gift of the power was not against
public policy, and its purpose was to save the franchise from
divided counsels and preserve it to the estate.   In ordering the
delivery of the proxy we are not enforcing a contract made by
the petitioner, as in Foll's Ap., 91 Pa. 434, but a power which
was directly conferred by the will.   The estate is entitled to
the franchise, and it is the duty of the petitioner to exercise it,
and the refusal of the cotrustees to furnish the proxy takes
away the franchise and hinders the performance of the duty.
To justify this refusal to obey a mandatory order of the testa-
tor, the conduct of the voting trustee must be such as would
warrant his dismissal from the trust.   It will not be justified by
the belief of the cotrustees that his management of the busi-
ness of the corporation is faulty in method, or even ruinous in
policy ; the testator took the risk of that contingency, and gave
them no discretion ; and the petitioner is responsible only to
the corporation.   We find finally that the charges, so far as
they aver fraud on the part of the petitioner, either directly
towards the company or indirectly towards the estate, are not
established by the evidence ; and we therefore grant the prayer
of the petition."

The following dissenting opinion was filed by PENROSE, J. :

" The purpose of a proxy is simply to enable the owner of stock
to vote at a corporate election without being compelled to at-
tend in person.   The holder of the proxy is the servant, not
the master ; and it would be a gross breach of duty on his part
if, taking advantage of the trust confided in him, he should vote
contrary to the instructions or against the interest of his mas-
ter.   In the case before us, while the testator has said that the
stock which he has bequeathed to the petitioner and his coex-
ecutors in trust for the purposes set forth in the will, shall al-
ways be voted on by the petitioner, to whom the coexecutors,
in order to enable him so to do, are directed to give the neces-
sary proxies, it is far from clear that the givers of the proxies
were intended to be absolutely without voice as to how the
power thus conferred should be exercised.   And even if the
will contained an express grant of an exclusive right to the
petitioner to determine how the stock should be voted, it could

not be doubted that any exercise of his authority to the prejudice of the interests of the estate would be restrained. That a trustee, or one having a naked power, cannot avail himself of his position to obtain any personal benefit is a principle which requires no citation of authority. His sole object must be the promotion of the interest of his beneficiaries. As was said by Lord HATHERLY, in Duke of Portland v. Topham, 11 H. L. C. 32, one having such a power ' must fairly and honestly execute it, without having any ulterior object to be accomplished. He cannot carry into execution any indirect object, or acquire any benefit for himself, either directly or indirectly. . . . He must act with good faith and sincerity, and with an entire and single view to the real purpose and object of the powers.'

" If a trustee having a complete power or authority would be restrained from exercising it for his own benefit and to the prejudice of the estate confided to his care, his position is infinitely worse where, as here, he comes as an actor, seeking the assistance of the court; and where it appears that not only a selfish purpose is intended (viz., his restoration to the management of the corporation, as president, with the emoluments incident to the office), but that his cotrustees and the cestui que trusts, in their answers, solemnly swear that the interests of the estate will be prejudiced. Under such circumstances, apart from the effect to be given responsive answers, he should be required to show, affirmatively and beyond all reasonable doubt, that the apprehensions are groundless; otherwise he should be left to such remedy as he may have at law or upon the settlement of the trustees' accounts. Equity will decline to interfere where the consequences of its action are uncertain, even if the complainant's case is entirely free from taint.

" The petitioner has not come up to the required standard; on the contrary, there are strong grounds for believing that the corporation whose stock is held for the trust is more prosperous, and the stock thus rendered more valuable to the estate, under the management which he seeks to displace, than it was under that which he asks us to aid him in having restored; while the admitted fact that he blended his private business, which appears to have been of quite an extensive character, with the

affairs of the company during his term of office, in itself affords a sufficient reason for withholding the aid of the court.

" That the respondents acquiesced at one time, if they did acquiesce, in the methods of the petitioner, is immaterial. The cestui que trusts have only a life estate in the trust, and the trustees would not be estopped even by the actual participation in an injurious course: Abbott v. Reeves, 13 Wright, 494. In my opinion the petition should be dismissed."

*Error assigned* was decree, quoting it.

*J. Willis Martin* and *John G. Johnson, J. Sergeant Price* with them, for appellant, cited: Tunis v. Hestonville R. R., 30 W. N. 96 [149 Pa. 70]; Pioneer Paper Co., 36 Howard, Prac. 112; Fisher v. Bush, 35 Hun, 641; Com. ex rel. Eberhardt v. Dalzell, 152 Pa. 217; Woodruff v. Dubuque and Sioux City R. R., 19 Abbott's New Cases, 437; Vanderbilt v. Bennett, 6 Pa. C. C. R. 193; Greenhood on Public Policy, 502; Wilson v. Proprietors of Central Bridge, 9 R. I. 590; Camden & Amboy R. R. v. Elkins, 37 N. J. Eq. 276; Hafer v. New York etc. R. R., 14 Weekly Law Bulletin (Ohio), 68; Steffy & Shimp's Ap., 76 Pa. 94; Palmer v. Harris, 60 Pa. 156; Aultman's Ap., 98 Pa. 505; Foll's Ap., 91 Pa. 434; Bell v. Farmers' Bk., 131 Pa. 318; Crowley v. Hicks, 72 Wis. 539.

*Geo. L. Crawford, Henry C. Loughlin* with him, for appellee, cited: Owen v. Owen, 1 Atk. 495; Williams on Executors, 946; Hill v. Tucker, 13 Howard, 466; Ervin v. P. & R. R. R., 7 R. & Corp. L. J. 87; Eberhardt v. Dalzell, 152 Pa. 217; Woodruff v. R. R., 19 Abbott, N. C. 437; Vanderbilt v. Bennett, 6 Pa. C. C. R. 193; Beach on Private Corporations, § 304; Com. v. Baldwin, 5 Pa. C. C. R. 509; Ashhurst's Ap., 60 Pa. 290.

PER CURIAM, April 17, 1893:

Mr. Justice THOMPSON, having been of counsel in the earlier stages of this case, took no part in the hearing, etc., of this appeal. The remaining six members of the court before whom it was heard being equally divided in opinion, the decree of the orphans' court stands as though the same had been affirmed.